### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | |
| Marla C. Martin, | ) | Case No. 24 B 13368 |
| | ) | |
| Debtor. | ) | Honorable Michael B. Slade |
| | ) | |

### MEMORANDUM OPINION FINDING VIOLATION OF
### BANKRUPTCY RULE 9011 AND IMPOSING SANCTIONS

On June 11, 2025, I issued an order directing the Semrad Law Firm, LLC ("Semrad") and Thomas E. Nield to show cause why they should not be sanctioned for filing a brief containing fake quotations and nonexistent authority manufactured by artificial intelligence and why their compensation does not exceed the reasonable value of their services pursuant to 11 U.S.C. § 329. (Dkt. No. 56)  Semrad then withdrew the offending brief (*see* Dkt. No. 58 (withdrawing Dkt. No. 51)), and it and Mr. Nield separately responded to my show cause order.  (*See* Dkt. Nos. 67, 71) Semrad also withdrew its application for compensation in this case.  (*See* Dkt. No. 68)  The United States Trustee and Chapter 13 Trustee both argue that I should sanction Semrad and Mr. Nield (*see* Dkt. Nos. 66 and 70) and it is now my duty to address the Show Cause Order.

While I appreciate Mr. Nield's and Semrad's remorse and candor, I find that they both violated Federal Rule of Bankruptcy Procedure 9011.  I further find that a modest, joint-and-several sanction of $5,500, paid to the Clerk of the Bankruptcy Court, along with a requirement that Mr. Nield and another senior Semrad attorney attend an upcoming course on the dangers of AI scheduled for the National Conference of Bankruptcy Judges (NCBJ) annual meeting in September, is the least harsh sanction that will appropriately address counsel's conduct and deter future, similar misconduct from them and others.  My reasons follow.

1

I.

On September 11, 2024, the Debtor and Semrad entered into this Court's form Court Approved Retention Agreement (CARA). Semrad filed the CARA along with the Debtor's signed voluntary petition under chapter 13 of the Bankruptcy Code and related papers on her behalf the next day. (*See* Dkt. No. 1)

This is the Debtor's eighth bankruptcy case. (*See* Dkt. No. 6) Each of the prior seven cases was dismissed for one reason or another. (*Id.*) Three of the Debtor's prior cases (Case Nos. 18-10082, 16-36239, 07-18870) were dismissed after confirmation because the Debtor failed to make plan payments. The other four (Case Nos. 18-02822, 16-36239, 07-13303, 07-01898) were dismissed before confirmation.

For its part, Semrad is a prolific filer of Chapter 13 cases; a material percentage of my docket consists of cases filed by that firm. And the Debtor and Semrad are very familiar with one another; Semrad had represented the Debtor in three prior bankruptcy cases before this one. Each time Semrad represented the Debtor before this case, the Debtor pursued and confirmed a chapter 13 plan, only to have her case dismissed when she was unable to comply with the plan's requirements. (*See* Case Nos. 18-10082, ECF Nos. 68 & 70; 12-28654, ECF Nos. 55, 56 & 65; 07-18870, ECF Nos. 74 & 75) And in each of those cases, Semrad petitioned for, and was awarded, attorneys' fees. In total, before this case, the Debtor had paid Semrad $8,958.45 for its services, but she is yet to complete a bankruptcy case successfully to earn a discharge.[1]

---

[1] According to the chapter 13 trustee's final report and account filed August 31, 2020, in Case No. 18-10082 (Dkt. No. 72), the trustee paid $894.45 to Semrad through the plan, and the debtor advanced $400 according to the fee application (Dkt. No. 16). According to the chapter 13 trustee's final report and account filed May 16, 2017, in Case No. 12-28654 (Dkt. No. 68), the trustee paid $3,500 to Semrad through the plan, and the debtor advanced $350 according to the fee application (Dkt. No. 14). And according to the chapter 13 trustee's final report and account filed February 24, 2009, in Case No. 07-18870 (Dkt. No. 77), the trustee paid $2,314 to Semrad through the plan, and the debtor advanced $1,500 according to the fee application (Dkt. No. 13).

This case has had its problems, too.  The primary challenge posed by the Debtor's current situation is that she did not pay the real estate taxes owed on her Chicago home between 2012 and 2018.  Creditor Corona Investments, LLC acquired rights to those payments and an associated tax lien secured by her home.  The Debtor's initial chapter 13 plan proposed a $1,600 monthly plan payment and would have paid Corona $74,735, providing 0% interest.  (Dkt. No. 10 §§ 2.1, 3.2)  That was obviously wrong, and Corona (since even before my appointment to the bench) objected to the Debtors' initial plan long ago, pointing out the error.  (*See* Dkt. No. 14 (*citing* 35 Ill. Comp. Stat. 200/21-75 and *In re Lamont*, 740 F.3d 397, 404 (7th Cir. 2014))

To give the Debtor a fair chance to confirm a plan that could save her home and the substantial equity she has in it, my predecessor and I continued the Debtor's confirmation hearing eight times to facilitate negotiations between her and Corona.  (*See* Dkt. Nos. 16, 20, 25, 29, 32, 37, 40, 46)[2]  Despite these efforts, after I entered a briefing schedule to consider Corona's objection (Dkt. No. 45), and briefs were filed (*see* Dkt. Nos. 49 & 51), I advised Semrad that I could not possibly confirm the then-latest proposed Plan because, even *if* I overruled Corona's objection, the Plan was clearly not feasible:  it proposed to pay creditors $2,400 per month (*see* Dkt. No. 43 § 2.1), while the schedules swore that the Debtor's disposable income was only $1,600 per month (*see* Dkt. No. 1, Schedule J, Line 23(c)).  When I pointed out that straightforward feasibility problem on June 10, Semrad advised the schedules on file were incorrect and the Debtor had more income than sworn.  Which is its own problem.  And while Debtor's counsel later filed amended schedules (Dkt. No. 72) and an amended Plan that matched them (Dkt. No. 73), the amended Plan did not comply with an order I had entered that required

---

[2]   The Chapter 13 Trustee dutifully pointed out the problems with Debtor's counsel's work since the beginning and asked that the case be dismissed last fall.  (*See* Dkt. No. 19)  My predecessor and I collectively continued the Trustee's motion to dismiss seven times, for the same reason:  to give the Debtor every reasonable opportunity to confirm a plan to save her home, if possible.  (*See* Dkt. Nos. 21, 27, 31, 39, 42, 48, 54)

any amended plan to be signed by both the Debtor and her counsel.  (*Compare* Dkt. No. 55 at 2 (order requiring Debtor's signature) *with* (Dkt. No. 73) (amended plan lacking signature))

I required the Debtor's signature on any proposed amended plan for a good reason.  On March 6, 2025, Debtor's counsel signed and filed on behalf of the Debtor a proposed Plan that (if confirmed) would have required the Debtor to make monthly plan payments of $2,600 for 60 months and to provide 18% interest to Corona on its claim.  (*See* Dkt. No. 35, §§ 2.1, 3.2)  But on April 8, 2025, the Debtor personally appeared in Court (while Mr. Nield appeared via Zoom) and told me that she did not agree with the plan that her counsel had filed—suggesting the plan had been filed without her approval.  Then, at the next hearing on June 10, 2025, when I asked Mr. Nield whether the Debtor was on board with a further-amended Plan (a question to which there are only two potential answers, yes or no), he equivocated, said that she "is, in some sense, in agreement with it" because she had made one monthly payment of $2,400 (the revised monthly payment called for in the then-current proposed Plan), while also confirming she had not signed off on the filing of amended schedules that would make that Plan feasible.  (*See* Dkt. No. 65 (6/10/25 Hr'g Tr.))  That is why my June 10 order required "that both the Debtor *and* the Debtor's counsel sign any amended plan before it is filed."  (*See* Dkt. No. 55 at 2 (emphasis in original))  Unfortunately, neither directive was honored; Semrad filed an amended plan without the Debtor's signature eight days after the deadline. (*See* Dkt. No. 73)

The Plan was finally confirmed earlier this week (*see* Dkt. No. 75), but suffice it to say that I have real concerns about the way that this case has been handled.  I expect materially more care from Debtor's counsel.  And the Chapter 13 Trustee has expressed broader concerns about Debtor's counsel generally, alleging (among other things) that Semrad often has clients sign blank signature forms, which leads to the filing of inaccurate sworn declarations, and often files

4

cases without possessing (or being able to procure on a timely basis) basic documents necessary to prosecute any Chapter 13 case. (*See* Dkt. No. 69 (Chapter 13 Trustee's Response to Court's Rule to Show Cause))

The Chapter 13 Trustee's allegations are very serious. But I am not taking the allegations into account in this ruling because Semrad did not have an opportunity to respond to them, they relate primarily to the section 329 examination that is unnecessary given Semrad's withdrawal of its fee petition, and the reason for the Order to Show Cause was limited to the fake citations in Semrad's response brief. However, the allegations are consistent with my general observation that Semrad should be taking more care when filing and prosecuting Chapter 13 cases than has been shown here.

## II.

I described in my Show Cause Order (Dkt. No. 56) the problem that led us here. To summarize: I entered a briefing schedule to help me resolve the dispute between the Debtor and Corona; it required Corona to file a written objection to the proposed plan while giving the Debtor a chance to respond. (Dkt. No. 45) Corona then filed a "kitchen sink" objection, disputing feasibility and challenging the plan treatment offered to it and other creditors. (Dkt. No. 49) The Debtor's response—signed by Mr. Nield and Semrad on her behalf—argued that Corona lacked standing to make any arguments other than disputes over the treatment of Corona's own claim. (*See* Dkt. No. 51)

While the argument that creditors lack standing to complain about the treatment of other creditors if it does not impact the objector directly rang true, the claim that Corona lacked standing to object to *feasibility* did not. So my staff and I began to examine the issue in depth to see if Semrad's argument was supported by the caselaw. We found the following:

5

| What Counsel's Brief Claimed | What Actually Exists |
|---|---|
| "*In re Montoya*, 341 B.R. 41 (Bankr. D. Utah 2006). The court held that '[a] secured creditor's standing to object to confirmation is limited to issues that affect its rights directly.' Secured creditors cannot object based on disposable income or plan feasibility because those issues do not impact their claims." (Dkt. No. 51, at 1-2) | *In re Montoya*, 341 B.R. 41 (Bankr. D. Utah 2006) exists, and the citation is correct.  However, not only does the language quoted by counsel not appear anywhere in the court's opinion, but the opinion does not address issues of standing at all.  The opinion certainly does not dispute a secured creditor's right to challenge the feasibility of a chapter 13 plan. |
| "*In re Jager*, 344 B.R. 349 (Bankr. D. Colo. 2006).  The court found that secured creditors are 'not entitled to raise objections related to other creditors or the debtor's disposable income.' These objections fall within the purview of the Chapter 13 trustee." (Dkt. No. 51, at 2) | *In re Jager*, 344 B.R. 349 (Bankr. D. Colo. 2006) does not exist. |
| "*In re Coleman*, 373 B.R. 907 (Bankr. W.D. Wis. 2007).  A secured creditor may only object to confirmation where 'the plan proposes to alter the treatment of its secured claim in violation of §1325(a)(5).'  Here, there is a limited issue regarding Corona's rights as they pertain to § 1325(a)(5), none of which are brought up in lines 16-20." (Dkt. No. 51, at 2) | *In re Coleman*, 373 B.R. 907 exists, although the case is from the Bankruptcy Court in the Western District of Missouri, not Wisconsin.  Again, not only does counsel's quotation not appear in the case at all, the opinion does not discuss the proposition for which it is cited, let alone support it. |
| "*In re Russell*, 458 B.R. 731 (Bankr. E.D. Wis. 2011). The Court said 'A secured creditor's standing is limited to objecting to the treatment of its claim. It lacks standing to object to confirmation based on issues like feasibility or disposable income that do not directly impact its rights.'" (Dkt. No. 51, at 2) | *In re Russell*, 458 B.R. 731, exists, although the case is from the Bankruptcy Court in the Eastern District of Virginia, not Wisconsin, and is from 2010, not 2011.  Yet again, the quotation from counsel's brief does not appear anywhere in the court's opinion, and the opinion does not touch on the topic of standing at all. |

In sum, what happened here is that Mr. Nield cited four cases for a proposition of law, but none of them exist as alleged in his brief.  Worse still, none of the quotations relied upon in the Semrad brief are actual statements written by any court.

I raised the problems created by these apparently fake citations at the hearing on June 10. I asked Mr. Nield directly whether he used some sort of AI to come up with this portion of his brief, and he stated the following:  "I think the citation element of these cases, I guess, was – I ran it through AI to some extent, but I didn't think that the citation was wrong."  (Dkt. No. 65,

6

6/10/25 Hr'g Tr. at 20:10-13)  I then issued my Show Cause Order (Dkt. No. 56), describing the problem in detail and directing both Mr. Nield and Semrad to respond.

To his credit, Mr. Nield appears to both understand what he did wrong and to be remorseful for it.  He states that he "had never used AI to do any legal research prior to this specific instance," and he "simply entered queries into the program which elicited problems." (Dkt. No. 71 at 2)  Mr. Nield then "did not review the relevant, underlying quotes from the opinions cited by the AI program" because he "assumed that an AI program would not fabricate quotes entirely."  (*Id.*)  Mr. Nield promises that he will never again use an AI program to do legal research "without checking every element of the AI's work product" and advises that he "has self-reported his behavior to the IARDC and is willing to take steps this Court deems necessary to ensure this never happens again."  (*Id.* at 3)

For its part, Semrad states that, as a firm, it "strictly prohibits using AI for legal research or the generation of legal citations without manual verification" and that Mr. Nield's use of ChatGPT for this purpose was "outside of the firm's research protocol."  (Dkt. No. 67 at 1–2) Semrad does not identify how it communicated that restriction on AI use to its attorneys and staff or what the firm's "research protocol" was prior to this case, but claims to have conducted an internal investigation (of unspecified breadth) which did not reveal other instances of improper AI usage prior to this one.  (*Id.* at 2)  That said, in recognition of the problem here, Semrad (1) withdrew its request for compensation in this case; (2) created a formal Artificial Intelligence Policy (which went into effect after, and as a result of, this incident); (3) required all attorneys at the firm to complete online CLE training in the "ethical and appropriate use of AI in legal practice"; and (4) offered to reimburse opposing counsel for time reviewing the offending brief. (*Id.* at 2-3)

III.

Federal Rule of Bankruptcy Procedure 9011(b)(2) provides that:

> By presenting to the court a petition, pleading, written motion, or other document—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that, to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument to extend, modify, or reverse existing law, or to establish new law.

What happened here does not appear to have been addressed in a published Bankruptcy Court opinion before, but there is a body of District Court cases where counsel submitted briefs containing fake cases or quotations "hallucinated" by AI, and Federal Rule of Civil Procedure 11 is "essentially identical" to Bankruptcy Rule 9011.  *Baermann v. Ryan (In re Ryan)*, 411 B.R. 609, 613 (Bankr. N.D. Ill. 2009).  The holdings of those District Court cases are both uniform and highly persuasive:  "At the very least, the duties imposed by Rule 11 require that attorneys read, *and thereby confirm the existence and validity of*, the legal authorities on which they rely." *Benjamin v. Costco Wholesale Corp.*, No. 24-cv-7399, 2025 WL 1195925, at *5 (E.D.N.Y. Apr. 24, 2025) (quoting *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) (emphasis added in *Benjamin*)).[3]  It is undisputed that Mr. Nield did not do so.  Thus, he violated Federal Rule 9011.

The sanctions available for violations of Rule 9011 include a nonmonetary directive, an order to pay a penalty into court, or in some circumstances an order directing the violator to pay

---

[3]  *See also, e.g.*, *Mid Central Operating Engineers Health & Welfare Fund v. HoosierVac LLC*, No. 24-cv-00326, 2025 WL 574234, at *3, 5 (S.D. Ind. Feb. 21, 2025) (recommending sanctions for citing authorities "hallucinate[d]" by artificial intelligence in court filings); *Gauthier v. Goodyear Tire & Rubber Co.*, No. 23-CV-281, 2024 WL 4882651, at *3 (E.D. Tex. Nov. 25, 2024) (imposing sanctions under Fed. R. Civ. Pro. 11(b) for filing a brief that included fake case law generated by artificial intelligence "without reading the cases cited, or even confirming the existence or validity of the cases included"); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 465 (S.D.N.Y. 2023) (same); *Garner v. Kadince, Inc.*, No. 20250188-CA, 2025 WL 1481740, at *3 (Utah Ct. App. May 22, 2025) (same).

8

his or her opponent's attorneys' fees.  *See* Fed. R. Bankr. P. 9011(c)(4).  And where (as here)

sanctions are to be imposed, "[a]bsent exceptional circumstances, a law firm must be held jointly

responsible for a violation committed by its partner, associate, or employee."  Fed. R. Bankr. P.

9011(c)(1).  But sanctions "must be limited to what suffices to deter repetition of the conduct or

deter comparable conduct by others similarly situated."  Fed. R. Bankr. P. 9011(c)(4).

As I advised in my Show Cause Order, courts in similar cases have issued monetary

sanctions of up to $15,000, along with various non-monetary sanctions.  (Dkt. No. 56 at 3)[4]

Below is a chart detailing the sanctions imposed in some of the recent similar cases:

| Case | Facts | Sanctions |
|---|---|---|
| *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025) | Plaintiff's counsel filed Motions in Limine citing nine cases; eight did not exist.  Following an Order to Show Cause, the attorneys admitted that the cases were hallucinated by an AI platform.  The drafter stated that it was his first time using AI in this way and he didn't learn the cases were questionable until the Court asked him to Show Cause.<br><br>After the Order to Show Cause issued, counsel: (1) withdrew the Motions, (2) were forthcoming about the use of AI, (3) paid opposing counsel's fees for defending the Motions, and (4) implemented policies and training to prevent another occurrence. | The Court revoked the drafter's pro hac vice status and imposed a $3,000 fine. The Court also imposed a sanction of $1,000 on each of the two attorneys who signed, but did not draft, the motions (for a total of $5,000 in fines). |
| *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, No. 24-cv-00326, 2025 WL 574234 (S.D. Ind. Feb. 21, 2025) | Defendant's counsel filed a brief that cited an alleged Seventh Circuit case the magistrate judge could not locate because it was fake.  The magistrate judge reviewed counsel's prior submissions and found similar issues in two other briefs.  After the magistrate judge issued an Order to Show Cause, the lawyer admitted his error and took CLE courses on AI use. | The magistrate judge recommended that counsel be sanctioned $15,000. The District Court adopted the recommendation but reduced the penalty to $6,000.  *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, No. 24-cv-00326, 25 WL 1511211 (S.D. Ind. May 28, 2025). |

---

[4] *See also Attaway v. Illinois Dep't of Corr.*, No. 23-cv-2091, 2025 WL 1101398, at *3 (S.D. Ill. Apr. 14, 2025) ("With the rise of incorrect citations and new emerging technologies, courts have assessed monetary sanctions anywhere from $2,000 to $15,000 for violations similar to Plaintiff's conduct.").

| Case | Facts | Sanctions |
|---|---|---|
| *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443 (S.D.N.Y. 2023) | Plaintiff's counsel filed an "Affirmation in Opposition" to Defendant's motion, which cited and quoted purported judicial decisions that did not exist.<br><br>After Defendant's counsel pointed out the flaws with Plaintiff's cited case law, Plaintiff's counsel did not withdraw the offending brief or volunteer an explanation to the Court.<br><br>At the hearing on the Court's subsequent Order to Show Cause, authoring counsel revealed that he had used ChatGPT, claiming he had not known that ChatGPT was capable of making up cases, and signing counsel admitted that he reviewed the Affirmation for style but made no inquiry into the author's research, even though the author had no familiarity with the law at issue. | The attorneys were required to send the sanctions opinion, the Affirmation, and the sanctions hearing transcript, with a cover letter, to their client and to each judge falsely identified as the author of a fabricated opinion (and to file copies of the letters sent on the case docket). In addition, the Court imposed a $5,000 joint and several penalty on the attorneys. |
| *Coomer v. Lindell*, Case No. 22-cv-01129, 2025 WL 1865282 (D. Colo. July 7, 2025) | Defense counsel filed a brief that contained erroneous AI-generated citations. They claimed a prior draft had been mistakenly filed, rather than a corrected final version. However, the alleged final version they contended they meant to upload had many of the same erroneous citations, among other deficiencies. The Court also took judicial notice that Defense counsel took steps to correct similar issues in a brief filed before a different federal court just days after it had issued the order to show cause in this matter. | Two lawyers were each ordered to pay $3,000 (for a total of $6,000), and one of the penalties was jointly and severally ordered against the lawyer and his law firm. |
| *Benjamin v. Costco Wholesale Corp.*, No. 24-CV-7399, 2025 WL 1195925 (E.D.N.Y. Apr. 24, 2025) | The Court was unable to locate five out of seven cases cited by Plaintiff's counsel in a reply brief and issued an Order to Show Cause.<br><br>In her Response, Plaintiff's counsel admitted that the five cases did not exist, said she used an AI platform called ChatOn, and claimed she failed to sufficiently review the reply before filing it because she was pressed for time. She stated she had never used AI for anything | The Court ordered counsel to identify (1) the two CLE classes that she already took and whether she was required to pay for them; and (2) the prospective CLE classes she intended to take. After receiving that information, the Court issued a monetary sanction of $1,000. |

10

| Case | Facts | Sanctions |
|---|---|---|
|  | law related before, and informed the Court that she took and intended to take CLE classes regarding the use of AI in federal court practice. |  |
| *Ramirez v. Humala,* No. 24-CV-242, 2025 WL 1384161 (E.D.N.Y. May 13, 2025)[5] | Four of eight cases cited by Plaintiff's counsel were hallucinated by AI, and the Court issued a Show Cause Order.<br><br>In response, Plaintiff's counsel admitted the error, apologized, and conducted a full internal investigation. | The Court ordered a joint and several penalty of $1,000 on the attorney and her law firm. |

Mr. Nield and Semrad ask me not to sanction them at all given that they have already voluntarily: (1) admitted their misconduct and promised not to do it again; (2) withdrawn any application for compensation in this case; and (3) watched an online CLE video. But while I appreciate their candor and efforts, "[t]here must be consequences." *Ferris v. Amazon.com Servs., LLC*, No. 24-cv-304, 2025 WL 1122235, at *2 (N.D. Miss. Apr. 16, 2025). While I believe this mistake was unintentional, a "citation to fake, AI-generated sources . . . shatters [] credibility" and "imposes many harms." *Kohls v. Ellison*, No. 24-cv-3754, 2025 WL 66514, at *4–5 (D. Minn. Jan. 10, 2025). So the consequences "are steep." *Id.* at *5.

---

[5] I reviewed the unpublished opinions that Mr. Nield referred to in his brief (*see* Dkt. 71 at p. 4-5) and they do not change my thinking in this case. The Memorandum Opinion in *Iron Tax, Accounting & Fin. Sols., LLC v. Story Law Firm, P.L.L.C.*, No. 23-CV-5243 (W.D. Ark. April 8, 2025), ECF No. 49, attached as Exhibit B to Mr. Nield's brief, merely includes a footnote (at page 16, n.2) in resolving summary judgment and *Daubert* motions that flags (presumably for the first time) counsel misciting a few cases, commenting that "short of the use of AI, it is unclear how such errors would slip past a reasonably diligent attorney." That the Court declined to pursue the matter further for reasons unknown does not weigh against imposing sanctions here. In *Araujo v. Wedelstadt*, No. 23-cv-1190 (E.D. Wis. Jan 22, 2025), the offending lawyer realized the errors in his response before the court's consideration and amended the pleading identifying the incorrect citations. *Id.*, ECF Nos. 35, 38. The court's decision (attached as Exhibit C to Mr. Nield's brief, *see* Dkt. 71, Ex. C) calls the use of AI "unacceptable," but let counsel off with only a warning, presumably on account of his rectifying the error early. I also reviewed the transcript that Mr. Nield attached as Exhibit A to his brief, where a court declined to sanction counsel after finding, among other things, that the offending attorney had already experienced "adverse" publicity from his misconduct that "sent the necessary message" not to do it again. Hr'g Tr. at 18:1–4, *Iovino v. Michael Stapleton Associates, Ltd.*, No. 21-CV-64 (W.D. Va. Oct. 30, 2024), ECF No. 204. To me, these outcomes are at the lenient end of a spectrum of various responses a Court can have to this situation. For the reasons I give in this opinion, I believe a modest sanction is appropriate here.

The first reason I issue sanctions stems from Mr. Nield's claim of ignorance—he asserts he didn't know the use of AI in general and ChatGPT in particular could result in citations to fake cases. (Dkt. No. 71 at 3) Mr. Nield disputes the court's statement in *Wadsworth* that it is "well-known in the legal community that AI resources generate fake cases." 348 F.R.D. at 497. Indeed, Mr. Nield aggressively chides that assertion, positing that "in making that statement, the *Wadsworth* court cited no study, law school journal article, survey of attorneys, or *any* source to support this blanket conclusion." (Dkt. No. 71 at 3–4, emphasis in Mr. Nield's brief as filed)

I find Mr. Nield's position troubling. At this point, to be blunt, any lawyer unaware that using generative AI platforms to do legal research is playing with fire is living in a cloud. This has been a hot topic in the legal profession since at least 2023, exemplified by the fact that Chief Justice John G. Roberts, Jr. devoted his 2023 annual Year-End Report on the Federal Judiciary (in which he "speak[s] to a major issue relevant to the whole federal court system," Report at 2) to the risks of using AI in the legal profession, including hallucinated case citations.[6] To put it mildly, "[t]he use of non-existent case citations and fake legal authority generated by artificial intelligence programs has been the topic of many published legal opinions and scholarly articles as of late."[7] At this point there are *many* published cases on the issue—while only a sampling are cited in this opinion, all but one were issued before June 2, 2025, when Mr. Nield filed the offending reply. *See, e.g.*, Jaclyn Diaz, *A Recent High-Profile Case of AI Hallucination Serves*

---

[6]   *Available at* https://www.supremecourt.gov/publicinfo/year-end/2023year-endreport.pdf.

[7]   *O'Brien v. Flick*, No. 24-61529-CIV, 2025 WL 242924, at *6 (S.D. Fla. Jan. 10, 2025); *see also Willis v. U.S. Bank Nat'l Ass'n,* No. 25-cv-516, 2025 WL 1408897, at *1 (N.D. Tex. May 15, 2025) ("It is no secret that generative AI programs are known to 'hallucinate' nonexistent cases, and with the advent of AI, courts have seen a rash of cases in which both counsel and *pro se* litigants have cited such fake, hallucinated cases in their briefs.") (quoting *Sanders v. United States*, 176 Fed. Cl. 163, 169 (2025); *Evans v. Robertson*, No. 24-13435, 2025 WL 1483449, at *2 (E.D. Mich. May 21, 2025) (same, with same quote); *Benjamin*, 2025 WL 1195925, at *1 (citing the numerous judicial opinions in recent weeks and months that address the "epidemic" of lawyers citing fake cases after using AI to perform legal research).

*as a Stark Warning*, NPR ILLINOIS (July 10, 2025, 12:49 PM), https://www.nprillinois.org/2025-07-10/a-recent-high-profile-case-of-ai-hallucination-serves-as-a-stark-warning ("There have been a host of high-profile cases where the use of generative AI has gone wrong for lawyers and others filing legal cases . . . . It has become a familiar trend in courtrooms across the U.S.").  The Sedona Conference wrote on the topic in 2023.[8]  Newspapers, magazines, and other well-known online sources have been publicizing the problem for at least two years.[9]  And on January 1, 2025, the Illinois Supreme Court issued a "Supreme Court Policy on Artificial Intelligence" requiring practitioners in this state to "thoroughly review" any content generated by AI.[10]

---

[8]   *See, e.g.*, Hon. Xavier Rodriguez, *Artificial Intelligence (AI) and the Practice of Law*, 24 SEDONA CONF. J. 783, 784, 791 (2023) ("[T]here is a need for education in the legal community to understand errors or 'hallucinations' that may occur in the output of the [large language models] powering these platforms. Attorneys and courts need to be aware of both the benefits and limitations that these AI platforms present."), cited in *Versant Funding LLC v. Teras Breakbulk Ocean Navigation Enters., LLC*, No. 17-CV-81140, 2025 WL 1440351, at *4 (S.D. Fla. May 20, 2025).

[9]   *See* Nicole Black, *Do NOT, I Repeat, Do NOT Use ChatGPT For Legal Research* (June 22, 2023, 1:47 PM), https://abovethelaw.com/2023/06/do-not-i-repeat-do-not-use-chatgpt-for-legal-research/ (Generative AI tools "are bald-faced liars that pull facts out of thin air . . . , including legal cases"); *see also, e.g.*, Benjamin Weiser, *Here's What Happens When Your Lawyer Uses ChatGPT*, N.Y. TIMES (May 27, 2023), https://www.nytimes.com/2023/05/27/nyregion/avianca-airline-lawsuit-chatgpt.html; Larry Neumeister, *Lawyers Submitted Bogus Case Law Created by ChatGPT. A Judge Fined Them $5,000*, ASSOCIATED PRESS (June 22, 2023), https://apnews.com/article/artificial-intelligence-chatgpt-fake-case-lawyers-d6ae9fa79d0542db9e1455397aef381c; Erin Mulvaney, *Judge Sanctions Lawyers Who Filed Fake ChatGPT Legal Research*, WALL ST. J. (June 22, 2023), https://www.wsj.com/us-news/judge-sanctions-lawyers-who-filed-fake-chatgpt-legal-research-9ebad8f9; and LegalEagle, *How to Use ChatGPT to Ruin Your Legal Career*, YOUTUBE.COM (June 10, 2023), https://www.youtube.com/watch?v=oqSYljRYDEM (cited in *Schoene v. Ore. Dep't of Human Servs.*, No. 23-cv-742, 2025 WL 1755839, at *7 n.6 (D. Or. June 25, 2025)); and Lyle Moran, *Lawyer Cites Fake Cases Generated by ChatGPT in Legal Brief*, LegalDive (May 30, 2023), https://www.legaldive.com/news/chatgpt-fake-legal-cases-generative-ai-hallucinations/651557/; Sara Merken, *AI 'Hallucinations' in Court Papers Spell Trouble for Lawyers*, REUTERS (Feb. 18, 2025, 2:55 PM), http://reuters.com/technology/artificial-intelligence/ai-hallucinations-court-papers-spell-trouble-lawyers-2025-02-18/ (both cited in *Powhatan Cnty. Sch. Bd. v. Skinger*, No. 24cv874, 2025 WL 1559593, at *9 n.7 (E.D. Va. June 2, 2025)).

[10]  *Available at* https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/e43964ab-8874-4b7a-be4e-63af019cb6f7/Illinois%20Supreme%20Court%20AI%20Policy.pdf (Effective Jan. 1, 2025) ("Attorneys, judges, and self-represented litigants are accountable for their final work product. All users must thoroughly review AI-generated content before submitting it in any court proceeding to ensure accuracy and compliance with legal and ethical obligations. Prior to employing any technology, including generative AI applications, users must understand both general AI capabilities and the specific tools being utilized.").

Counsel's professed ignorance of the dangers of using ChatGPT for legal research without checking the results is in some sense irrelevant. Lawyers have ethical obligations not only to review whatever cases they cite (regardless of where they pulled them from), but to understand developments in technology germane to their practice.[11] And there are plenty of opportunities to learn—indeed, the Illinois State Bar Association chose "Generative Artificial Intelligence – Fact or Fiction" as the theme of its biennial two-day Allerton Conference earlier this year, calling the topic "one that every legal professional should have on their radar."[12] Similar CLE opportunities have been offered across the nation for at least the past two years.

The bottom line is this: at this point, no lawyer should be using ChatGPT or any other generative AI product to perform research without verifying the results. Period. *See, e.g.*, *Lacey v. State Farm Gen. Ins. Co.*, No. CV 24-5205, 2025 WL 1363069, at *3 (C.D. Cal. May 5, 2025) ("Even with recent advances, no reasonably competent attorney should out-source research and writing to this technology—particularly without any attempt to verify the accuracy of that material."); *Mid Cent. Operating Eng'rs*, 2025 WL 574234, at *2 ("It is one thing to use AI to assist with initial research, and even non-legal AI programs may provide a helpful 30,000-foot view. It is an entirely different thing, however, to rely on the output of a generative AI program without verifying the current treatment or validity—or, indeed, the very existence—of the case presented."). In fact, given the nature of generative AI tools, I seriously doubt their utility to assist in performing accurate research (for now). "Generative" AI, unlike the older "predictive"

---

[11] *See, e.g.*, ABA Model Rule 1.1, Comment 8, made applicable here by Local Bankruptcy Rule 9029-4A (and applicable to all Illinois lawyers following adoption by the Supreme Court of Illinois), requires lawyers to "keep abreast of changes in the law and its practice, including benefits and risks associated with relevant technology."

[12] Mallory P. Sanzeri, *Allerton Conference 2025: Exploring the Future of Law with Artificial Intelligence*, ILLINOIS STATE BAR ASSOCIATION, https://www.isba.org/sections/ai/newsletter/2025/03/allertonconference2025exploringthefutureoflawwitha (last visited July 17, 2025).

AI, is "a machine-learning model that is trained to *create* new data, rather than making a prediction about a specific dataset.  A generative AI system is one that learns to generate more objects that *look like* the data it was trained on."  Adam Zewe, *Explained: Generative AI*, MIT NEWS (Nov. 9, 2023), https://news.mit.edu/2023/explained-generative-ai-1109 (emphasis added). Platforms like ChatGPT are powered by "large language models" that teach the platform to create realistic-*looking* output.  They can write a story that reads like it was written by Stephen King (but wasn't) or pen a song that sounds like it was written by Taylor Swift (but wasn't).  But they can't do your legal research for you.  ChatGPT does *not* access legal databases like Westlaw or Lexis, draft and input a query, review and analyze each of the results, determine which results are on point, and then compose an accurate, Bluebook-conforming citation to the right cases—all of which it would have to do to be a useful research assistant.  Instead, these AI platforms look at legal briefs in their training model and then create output that *looks like* a legal brief by "placing one most-likely word after another" consistent with the prompt it received.  Brian Barrett, "*You Can't Lick a Badger Twice": Google Failures Highlight a Fundamental AI Flaw*, WIRED (Apr. 23, 2025, 7:44 PM), https://www.wired.com/story/google-ai-overviews-meaning/.

If anything, Mr. Nield's alleged lack of knowledge of ChatGPT's shortcomings leads me to do what courts have been doing with increasing frequency:  announce loudly and clearly (so that everyone hears and understands) that lawyers blindly relying on generative AI and citing fake cases are violating Bankruptcy Rule 9011 and will be sanctioned.  Mr. Nield's "professed ignorance of the propensity of the AI tools he was using to 'hallucinate' citations is evidence that [the] lesser sanctions [imposed in prior cases] have been insufficient to deter the conduct."  *Mid Cent. Operating Eng'rs*, 2025 WL 574234, at *3.

The second reason I issue sanctions is that, as described above, I also have concerns about the way this particular case was handled.  I understand that Debtor's counsel has a massive docket of cases.  But every debtor deserves care and attention.  Chapter 13 cases can be challenging to file and manage—especially when they involve complexities like those in this case.  If a law firm does not have the resources to devote the time and energy necessary to shepherd hundreds of Chapter 13 cases at the same time, it should refer matters it cannot handle to other attorneys who can—lest a search for time-saving devices lead to these kinds of missteps.  What I mean to convey here is that while everyone makes mistakes, I expect—as I think all judges do—attorneys to be more diligent and careful than has been shown here.[13]

IV.

The sanctions that I choose "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Bankr. P. 9011(c)(4).  And to be clear, I am *only* picking sanctions to redress the conduct described in the Order to Show Cause, *not* the further alleged misconduct described in the Chapter 13 Trustee's brief.  (*See* Dkt. No. 69 at 3)  I agree with the U.S. Trustee that the sanctions within my discretion include an ARDC referral, a monetary sanction, a finding that the compensation to be paid to counsel exceeds the reasonable value of their services per 11 U.S.C. § 329, and/or a non-monetary sanction.  Semrad has advised me that it will not seek compensation for this case, so a Section 329 finding is not necessary.  And Semrad advises that Mr. Nield has already self-reported to the ARDC, mooting that option, too.  What I believe is necessary here, and constitutes the least

---

[13]  Here's another example of what I am talking about:  Mr. Nield filed a reasonably compelling brief telling his side of the story (*see* Dkt. No. 71), but he did not sign it.  Bankruptcy Rule 9011(a) requires all briefs to be signed and provides that "[t]he court must strike an unsigned document unless the omission is promptly corrected after being called to the attorney's or party's attention."  I note this not just to point out another error caused by inattention, but to alert counsel that I am required by the Bankruptcy Rules to strike his brief if he does not sign and re-file it promptly.

harsh sanctions appropriate to address the conduct and deter repetition by others similarly situated, has two parts—one monetary and one non-monetary.

First, I order Mr. Nield and Semrad, jointly and severally, to pay a penalty to the Clerk of the Bankruptcy Court of $5,500.[14]  I seriously considered a larger fine, but after reading their briefs, I believe this sum is sufficient given the candor and remorse both Mr. Nield and Semrad have shown since the Order to Show Cause was issued, the seriousness with which they have addressed the Order already, and the attention they gave the Debtor to confirm the most recent Plan following the June 10 hearing.  I view this as a modest sanction, and the next lawyer who does the same thing is warned that he or she will likely see a more significant penalty.

Second, more education (and in-person education) is always better, and I believe additional in-person education is necessary given the conduct here.  Fortunately, this year's annual meeting of the National Conference of Bankruptcy Judges (NCBJ) is here in Chicago, making the meeting convenient and not burdensome for local attorneys to attend in person.  Even more fortuitously, during the meeting, at 9:00 a.m. on Friday, September 19, 2025, NCBJ will hold a plenary session titled "*Smarter Than Ever: The Potential and Perils of Artificial Intelligence*" to which all registered attendees and their guests are invited.[15]  Mr. Nield, and at least one other senior attorney at the Semrad firm (chosen by Mr. Semrad), are ordered to register for and attend that session of the NCBJ annual meeting in person.  Others reading this opinion are welcome, too.

---

[14]   Bankruptcy Rule 9011 requires that Semrad be equally responsible for Mr. Nield's conduct absent "exceptional circumstances."  *See* Fed. R. Bankr. P. 9011(c)(1).  I see no such "exceptional circumstances" here and thus a joint-and-several penalty is appropriate.

[15]   Annual Meeting Schedule, NCBJ, https://ncbj.org/annual-meeting/schedule-events/complete-schedule/.

V.

For the reasons stated here, I will issue a separate order,

1.      Finding that Thomas E. Nield and The Semrad Law Firm, LLC, have violated

Rule 9011 of the Federal Rules of Bankruptcy Procedure.

2.      Imposing sanctions for the violation of Rule 9011:

      a.      directing Mr. Nield and Semrad, jointly and severally, to pay a penalty of $5,500 to the Clerk of the Bankruptcy Court within 10 days,

      b.      directing Mr. Nield to register and attend in person the NCBJ plenary session on Artificial Intelligence, and

      c.      directing Semrad to have a second senior attorney register for and attend the NCBJ AI session in person; and

3.      Concluding the section 329 examination as moot.

Signed:   July 18, 2025                By:   _____

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE

18